Good morning, Your Honors, and may it please the Court, David Andrew Gaona, pro bono counsel for the petitioner in this case, Mr. Mercado. I'd like to reserve two minutes of my time this morning for rebuttal, if possible. Mr. Mercado entered this country 25 years ago as a very young child after fleeing a brutal civil war in El Salvador. He filed an asylum application at the age of 14, and in response to the Court's question raised earlier this week, it is very likely that he was entitled to derivative asylum at that time through his mother. What reason, if I was unable to determine what reason there was for the 15-year or so delay in bringing this case to a hearing, am I missing something in the record? Do we have any information about that? Your Honor, you're not missing anything in the record. The record is completely silent as to why there was such a significant delay between when the asylum application was filed and when Mr. Mercado finally received an interview. It would appear that the interview occurred only after there was some involvement with Mr. Mercado in the criminal justice system, but that's pure speculation at this point. That's really just based on the timing more than anything. The record is silent as to why that delay occurred. If, and I know this is a hypothetical, but if your client had received derivative asylum while he was a minor, and then he had committed the same crime that he committed, what result for his grant of asylum? Your Honor, that is a hypothetical because there are a number of things that could have happened since 1995. Whether or not he would have adjusted prior to that, we just don't know what would have happened. But had he been an unadjusted refugee, which is what his status would have been had derivative asylum been granted in 1995, the agency could have placed him into removal proceedings for having committed a particularly serious crime. Are you sure? I mean, what was the – the exact circumstances of the crime aren't completely clear. I don't know if there's criminal documents, but it – a particularly serious crime is like a reason why the IJ would not exercise its discretion in canceling removal. The crime didn't strike me as being an aggravated felony or a crime of moral It's sort of a different – falls into a different category of the law. Your Honor, it's my understanding that the agency could have placed him in removal proceedings as an unadjusted refugee. The issue of whether or not his criminal conviction in Arizona would be a particularly serious crime would become relevant in whatever proceedings those were. And as was raised in the briefs here, I would agree with you that I don't believe that the crime for assisting a criminal syndicate under Arizona law would constitute an aggravated felony. It certainly is not under the categorical approach. And I believe the limited documentation we have from the State court proceeding would not support a finding of an aggravated felony under the modified categorical approach, as that is determined now under the DACOM decision from 2013. The Arizona offense has a single undivided set of elements that I don't believe could be parsed out to support a finding of an aggravated felony on the record that we have. So it's not an automatic deportation or automatic removal because it's not an aggravated felony or a crime of violence type of offense. Is that right? That's correct, Your Honor. And what we have on the record now is a finding, at least in the alternative from the immigration judge, that was not disturbed by the BIA that this offense was for – was a particularly serious crime, which obviously has serious ramifications for any further proceedings that might occur in the agency. So to the extent a remand occurs, it's important that the finding of a particularly serious crime be reversed by this Court, because it is – it's clear that the I.J. did not file – did not follow, rather, the Attorney General's guidance set forth in INRI Y.L. in making an individualized determination as to each conviction. And it's equally clear, as we've been discussing, that there is a potential problem with the threshold determination that this was an aggravated felony, because a particularly serious crime, by its very definition, must be an aggravated felony under INA. So do we have any actual conviction documents in the record? Your Honor, we do have Mr. Mercado's change of plea, his transcript, although I do not believe beyond that there's any sort of transcript of judgment or the minute entry from the State court that would have memorialized a final conviction. I believe the transcript of the change of plea proceeding was really provided in the immigration court for purposes of establishing the factual basis of the plea, which the immigration judge in turn used to make both credibility findings that we state court conviction was for a particularly serious crime under INA. But that factual basis wasn't adopted by your client at the time. I mean, it wasn't something, a statement he made in open court, right? It was something that his attorney put out and then the defendant acquiesced to it in order to go through with his change of plea, correct? That's correct, Your Honor. And it may be that there are additional documents that could be considered if the immigration judge or the BIA on remand were to consider this under the modified categorical approach to determine whether it was an aggravated felony, but based on the text of the Arizona criminal statute alone for assisting a criminal syndicate, there are going to be significant difficulties in reaching the conclusion that this was an aggravated felony, because the offense does not necessarily have to involve drugs, and because the statute under Arizona, the Arizona statute, that is, has a single undivided set of elements that could not be parsed out under the DACOMP decision. So what we are left with is an agency record that is ambiguous as to what occurred not only in terms of the delay, the 15-year delay between the filing of the asylum application, but what, and it may very well be that there are documents in the agency record that will reveal that. We simply don't have those. We also don't have the original asylum application that was filed by Mr. Mercado's father in, I believe, 1989. It wouldn't appear that he and his sisters were listed on that application, given that there was no finding of derivative asylum there. But there may be, it's possible there are further documents in the agency record that would indicate that. What we do have is the undisputed fact that the asylum application was filed in 1995. There is also evidence, it's directly on Mr. Mercado's own application from 1995 at page 375 of the administrative record, that he's a member of the ABC class. That may have an impact on whether or not derivative asylum is, was called for at that time. What's the ABC class? The ABC class is a, there was a class action lawsuit that was filed by a, by Salvadoran and I believe it was Salvadoran and Guatemalan refugees in the early 1990s that related to how INS at the time was mishandling, allegedly, certain asylum applications that were being filed at the time. There was a settlement that was entered in that class action that entitled people who were a member of the class to a particular treatment by INS or a reexamination of certain asylum documents. Whether or not that settlement would have an effect on Mr. Mercado's claim here is less than clear, because we simply don't have all of the documents. And in any event, his treatment, whether or not he's entitled to relief under the ABC settlement is something that should be considered by the agency in the first instance, which further counsels in favor of a remand on an open record to allow the agency to sort out these additional issues along with the issues that were raised in the briefing before you. Did you want to save a little rebuttal time? I would like to do that, Your Honor. Thank you very much. We'll hear from the government next. Good morning, Your Honors. Margaret O'Donnell for the United States. Just as a matter of clarification, I referenced this matter as being lost, the application as being lost when I was discussing this with my client, and was informed that as a result of the ABC agreement, DHS or the former INS was deluged with applications and they adopted a first in. Well, counsel, let me just tell you, I'm speaking only for myself at this point, but it does seem to me that the delay, whatever the reason, worked to the detriment of this applicant. Absolutely. And I wonder whether this is a case that the government would consider placing into mediation to try to sort out some of the things that have been discussed today outside the context of litigation. Well, actually, Your Honor, that was what I was going to ultimately propose. Based on the question asked, which neither opposing counsel, prior counsel, any of the I was able to do, it appears that Mr. Mercado had done everything he could to be a member of the ABC class and a derivative on his mother's application. The statute cited in your question raises issues, as does a corresponding regulation that requires her to have done something within two years of being granted asylum. But whether that applies to ABC cases, we don't know. So in the interests of justice, I was going to propose either to allow the government to do a supplemental briefing on these issues or to remand, as counsel requested, on an open record. But mediation would be appropriate also. If you were to mediate, one of the things you could do is agree to defer under President Obama's new policy or actually take the time and spend mediation to, I mean, there's a lot of missing documents here. There are. We would have to combine the mother's case. That was one of the things we couldn't do in the few hours. Right. That was the disturbing thing to me in reading the decision. It was like the IJMDIA treated this as an entirely new application for asylum, and it was obvious that his prior application had languished. Well, and I think it's apparent in the comments that he makes on the record that he's trying to say, I'm a derivative. But who has that language outside of immigration lawyers? And then also for the IJ to make a finding of a particular serious crime without the documents that we have, and the Supreme Court has held are relevant documents to making that determination. I would like to point out, and I know that at this point it's almost moot, but the IJ decision does not come before this Court, because the board did not adopt it. The board refused to adopt it or didn't reach it. In their footnote, they said we're not interested in that issue. We're deciding only on statutory eligibility. Exactly. You're right about that. You're right about that. And which it compels even more in the interest of justice that this would go back on, if it goes back on, an open record, to allow all of that to come out. Because there's another issue in the record, and that is, I don't know if you have the record with you, but page 386 is the I-94 of his entry, and it says in here that he was entered under a deferred enforced status, which is something that came up only for a couple of years after the temporary protective status ended in the So he was actually admitted under, I believe admitted. I'm unable to tell because this is not my background. But this would, if this is right and this is at admission, then even the NTA in this case is wrong, which claims that he's, you know, came in without inspection. Without inspection, right. So there was, so help me through this. I don't know. I mean, to get to the bottom of this, and perhaps he has already been admitted, we don't even know, what's preferable, the mediation, or would the board reopen, or I don't know what the preferable route is here. To be honest, I don't either. Ultimately, DHS is going to have to take this back to the fundament and go forward. Start over, basically. And answer all of these questions. You know, we've got the legislation you talked about and the regulations. How do they impact this? Do they impact it? Is there something else in ABC that allows him, like in the Davila case, does he still have status as a derivative? And he's obviously been so prejudiced by the 15-year delay, because of course there's changed country conditions now. And that's absolutely. And in the interest also of, I mean, the family unity. I mean, doesn't he have a U.S. citizen wife and three U.S. citizen children? Yes, he does. He has huge equities. Yeah. And on the other side, he has the criminal history, which was minor up until that last event. Right. Which I think, as counsel put forward so well, that, you know, there's a lot to be explored as to whether or not that qualifies as a removal. I mean, that's a reasonable offense on a state level. So if it goes to mediation, would your office take care of the proceedings? That's how we work. We would try and shepherd it through. I just don't know that that's the most efficient way to do it. And I'm being frank. I don't know. I can't say based on my experience. It's not. I just don't know. If you start there, the parties could talk, and then you could... If it seemed inefficient, the parties could say, well, let's do an agreed remand instead of continuing the mediation. So it seems like it might be a good place to start. And that might be the best way to handle this. And we have pretty skilled mediators who've done a lot of these cases. Oh, I know. I've dealt with them. I got to commend them. It's just, you know, we're going to be herding cats in this. We've got not only ICE on this, but CIS, which is the organization that's responsible for the implementation of ABC. Right. And so we're going to be... And also, since then, they've changed. They're not even within the same departments. Well, yeah. Yeah. And since ABC is old and has, in a sense, expired pretty much, then there are a lot of people without knowledge who are working. And there's a lot of immigration attorneys who've never... It's been more than 20 years since it expired. So a lot of practicing immigration attorneys are unfamiliar, which I think is another reason why a lot of this happened. You know, I wasn't familiar with it. His first counsel wasn't familiar with it. But in his own words, I don't think you can avoid the fact that he's screaming out, I'm a derivative. I would like to just say again, speaking only for myself, but I really appreciate your candor and your willingness to work to resolve this case in an appropriate manner. It's very helpful. Well, it's my job, Your Honor, and my ethical obligation. But I also think there's something more to being on this side of the case than winning. I appreciate that. Thank you. Thank you. Mr. Guyona? And while I'm busy appreciating, I want to thank you for taking on this case pro bono, because in this and many other cases, it's extremely helpful to the court as well as to the clients to have that representation. And we're grateful. It's certainly my pleasure, Your Honor. It's my pleasure to be here today on behalf of Mr. Mercado to try to come to some resolution of this. I just want to address one issue, and that's the question of mediation versus a straight remand from this court. My limited experience with remand, I'm sorry, with mediation in these immigration cases, and it hasn't been my direct involvement, but rather assisting colleagues who have taken other pro bono cases in mediation, has been one of significant frustration with the agency in terms of getting documents or coming to some sort of mediated resolution when the two sides are usually very far apart. Now, Ms. O'Donnell. I was going to say it doesn't sound like you're really at all far apart in this case. We're not that far apart, but the logistical issues that the court has already identified, namely, I think it was the analogy used was herding cats, and it seems particularly apt here given all of the pieces that are going to be moving. And it may be best from my point of view to send this case directly back to the agency to let that be sorted out by a fact finder in the first instance. But that being said, I'm certainly not opposed to mediation as a first step. Well, they're not mutually exclusive, I think, because, excuse me, if the mediation piece seems unsatisfactory, the parties can agree to remand it as what they come up with. They can either come up with a substantive solution or they can come up with a solution that this needs to go back for fact finding. And I agree, Your Honor, and I think that if that's what the court sees fit, then we're more than happy to cooperate in every way with the government to come to a resolution of this case that recognizes the significant delay that has occurred and to try to come to an agreement as to how to proceed with Mr. Mercado's application. I think that would be best given, actually, given the fact that the IJs are within the Department of Justice and you're going to have to deal with DHS in part of this as well. And I think to the extent you've got a wonderfully cooperative person on the other side, I think that would be best for, you know, Judge Graber's solution, start with mediation and then see what happens. And if I may just comment on that briefly, Your Honor, that that would be perfectly fine and Ms. O'Donnell has been nothing but gracious since she's been involved in the case. Her involvement has been very limited, though. I think she just made an appearance here for the purpose of the argument, so it's my sincere hope that she stays involved. Hold on to her. Yes. I would like to hold on to her. Well, and thank you. I want to echo Judge Graber's sentiments to us, to both of you. Thank you. Thank you, Your Honor. The case just argued is submitted, and as I think we've made clear, we appreciate the efforts of both counsel.
judges: Graber, Wardlaw, Marquez